Paul Kremer (NJ No. 421702023)
Edward C. Wipper (*pro hac vice* pending)
Benesch, Friedlander, Coplan & Aranoff, LLP
Continental Plaza II
411 Hackensack Ave., 3rd Floor
Hackensack, New Jersey 07601-6323
(646) 593-7050

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ROBIN MCK, LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>MCKESSON CORPORATION,<br><br>*Defendant.* | Case No. _____<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Robin MCK, LLC f/k/a NRG Robin MCK LLC ("Robin MCK" or "Plaintiff"),

for its Complaint against McKesson Corporation ("McKesson" or "Defendant"), respectfully

alleges as follows:

**NATURE OF THE ACTION**

1.      Plaintiff Robin MCK brings this action against Defendant McKesson for willful

breach of contract and a wrongful attempt to terminate the Power Purchase Agreement dated as of

September 22, 2017, by and between Robin MCK and McKesson (as otherwise amended or

supplemented, the "PPA"), and the Solar Site Lease Agreement dated as of October 17, 2018, by

and between Robin MCK and McKesson (the "Lease," and together with the PPA, the

"Agreements").

2.      McKesson and Robin MCK (then doing business under its former name NRG

Robin MCK, LLC) entered into the PPA and later the Lease to allow Robin MCK to install a solar

electric facility (the "SEF" or the "System") on the rooftop and formerly vacant ground areas of McKesson's warehouse to help McKesson achieve its publicized goal of becoming more environmentally friendly.

3.      To recoup Robin MCK's $10 million investment to design, build and operate this solar facility, Robin MCK would receive payment for the electricity generated and delivered to McKesson, and Robin MCK would retain the benefit of the significant renewable energy credits and tax incentives over the life of the Agreements. The credits and incentives would offset Robin MCK's substantial upfront investment and afford Robin MCK the benefit of its bargain.

4.      But McKesson now seeks to deprive Robin MCK of the benefit of its bargain and prematurely terminate the Agreements only two years after Robin MCK completed the installation of the solar facility. As a pretext for its premature cancellation, McKesson contends that because of a fire at its warehouse, it is not safe to operate the solar facility on its roof.

5.      Despite clear contractual obligations to do so, McKesson refuses to allow Robin MCK the bargained for access to the warehouse rooftop to repair its panels and reenergize its rooftop system. Its justification—That it cannot be certain that the solar panels did not cause the fire. But all of the evidence gathered since the fire establishes that the rooftop HVAC unit designated RTU #7 (the "HVAC Unit"), not Robin MCK's solar panels, started the fire, which then spread to Robin MCK's rooftop solar facility.

6.      To date, McKesson has sought to obstruct, deflect, and shift the blame in an effort to deprive Robin MCK of its unconditional, bargained-for right to elect to repair and reenergize the System after the fire.

7.      Among other things, despite McKesson's assurances to Robin MCK in writing that its solar panels were being preserved, Robin MCK's insurance investigators found that the most

heavily damaged panels were instead removed, discarded in a dumpster, and mixed with other trash, making any reconstruction of the fire impossible.

8.      Now, almost two years after the fire, McKesson continues to refuse to allow Robin MCK access to the rooftop to repair and reenergize its System—and it has clearly communicated that it does not ever intend to do so—in clear breach of its obligations under the Agreements.

9.      Where there is an outage in the System that exceeds more than 48 daylight hours due to no fault of Robin MCK, McKesson is contractually obligated to pay Robin MCK the estimated Energy Output for the System so long as the outage continues, as well as the value of the tax incentives and renewable energy credits.

10.     After Robin MCK demanded that McKesson honor its contractual obligations and reimburse it for this prolonged outage, which will last for the entire term of the PPA, McKesson, for the first time, sought to sidestep the damages caused by its various breaches by attempting to invoke a limited provision of the PPA that could permit McKesson to terminate the contract for convenience and without cause, in certain circumstances and upon meeting certain criteria.

11.     But by its express terms, the PPA's termination for convenience provision is not available once McKesson fails to comply with the terms of the PPA.  In other words, once McKesson breached the PPA, it forfeited its right to terminate the PPA for its own convenience and without cause.

12.     As negotiations have stalled because McKesson refuses to pay what it owes under the PPA, Robin MCK brings this suit to recover from McKesson for its numerous breaches of the PPA and Lease, including McKesson's refusal to allow Robin MCK access to repair and reenergize the rooftop solar facility, its failure to maintain its Warehouse and HVAC unit in good repair so as not to interfere with Robin MCK's operations, its failure to compensate Robin MCK for the

prolonged unscheduled outage of the solar faculty, its obstruction of Robin MCK's efforts to mitigate damages, its failure to cooperate with Robin MCK's insurance claims, and its improper attempt to terminate the PPA and Lease for convenience and without cause.

## THE PARTIES' CITIZENSHIP,
## DIVERSITY JURISDICTION, GOVERNING LAW, AND VENUE

13.     Plaintiff is a Delaware limited liability company.  It is owned by Greenbacker Renewable Energy Corporation ("Greenbacker") through a series of other single member limited liability companies.  There are no other individuals or corporations in the ownership structure other than Greenbacker.

14.     Greenbacker is a Maryland corporation with its principal place of business in New York State.

15.     Accordingly, Robin MCK is a citizen of Maryland and New York for the purposes of diversity jurisdiction under 28 U.S.C. § 1332.

16.     McKesson is a Delaware corporation with its principal place of business in Texas.

17.     Accordingly, McKesson, the sole defendant in this lawsuit, is a citizen of Delaware and Texas for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

18.     Because the sole plaintiff, Robin MCK, is a citizen of Maryland and New York and the sole defendant, McKesson, is a citizen of Delaware and Texas, complete diversity of citizenship exists between Robin MCK and McKesson.

19.     The amount in controversy exceeds $75,000.

20.     As such, this Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a).

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in, and a substantial part of the property that is the subject of the action is located in, Robbinsville, New Jersey.

22.     Section 19(a) the PPA designates California as the choice of law governing the interpretation of the PPA.

23.     Section 28 of the Lease provides that disputes related to the Lease are governed by the laws of the location of the Premises (as defined below), which is the State of New Jersey.

<u>**FACTS COMMON TO ALL CAUSES OF ACTION**</u>

**A.**     **The Parties and the Premises**

24.     Greenbacker is an independent power producer that generates power, invests in power generation technology, and sells renewable power to high-creditworthy utilities, municipalities, and corporations.

25.     Greenbacker's renewable energy assets, which it both owns and operates, include solar plants, wind farms, and battery storage systems across the continental United States and Hawaii.

26.     By 2023, Greenbacker's clean energy generation and storage capacity was approximately 3.8 Gigawatts, and it had generated nearly 9 million MWh of renewable energy, supporting 6,441 jobs.

27.     Through its investment management operations, Greenbacker manages direct investments in renewable energy, providing individual investors with opportunities to fund profitable sustainable infrastructure projects, which are usually only available to institutional investors.

28.     Greenbacker manages approximately $3.8 billion in assets and represents over 11,000 shareholder investors.

29.     Plaintiff Robin MCK is the limited liability company that owns and operates Greenbacker's System, also known as a solar power plant, located on the roof of and on the grounds adjacent to a warehouse (the "Warehouse") located at the parcel of real property located at 1 John Henry Drive, Robbinsville, New Jersey 08691 (the "Premises"). The Premises and the Warehouse are owned by McKesson.

30.     Defendant McKesson is a publicly traded corporation that distributes pharmaceuticals, medical supplies, and medical technology in the United States. According to McKesson's public filings, McKesson uses the Warehouse on the Premises to store and distribute pharmaceutical products to portions of the northeastern United States.

**B.     To Allow McKesson to Promote Its Sustainability Initiatives, the Parties Entered into a Power Purchase Agreement Where Robin MCK Would Construct a Solar Electric Facility, at Its Cost, With the Agreement that <u>It Would Recover Its Investments Over the Life of the Power Purchase Agreement</u>**

31.     The genesis of the project dates back to 2017, when McKesson was promoting sustainability initiatives.

32.     McKesson partnered with NRG Renew LLC, NRG Solar Asset Management, and other affiliates of NRG Energy, Inc. (collectively, "NRG") to pursue potential green energy solutions for the facilities located on the Premises.

33.     The Premises are an ideal location for a solar power plant, because they contain significant amounts of unoccupied flat space in an industrial neighborhood with few tall trees in the vicinity.

34.     In other words, there is sufficient space to install a large solar facility, which would have access to abundant sunlight.

35.     On September 22, 2017, Robin MCK (then an NRG affiliate doing business under the name "NRG Robin MCK LLC") and McKesson entered into the PPA.

36.    The PPA contains the terms whereby Robin MCK was to install and construct the SEF on the Premises at its own sole cost and expense.

37.    The SEF would be split between over 5,238 roof-mounted solar panels covering almost the entire surface of the roof and 2,340 ground-mounted solar panels, with a capacity of approximately 2,718 kW/AC and 2,100 kW/DC of all of which would supply power to McKesson's Warehouse.

38.    By way of comparison, the capacity the SEF would be able to supply the hourly electrical usage equivalent of approximately 3,600 residential homes.

39.    The parties understood that the installation of the SEF would be a massive and expensive undertaking that would cost over $10 million to build and to energize, with Robin MCK's bearing the sole cost and expense of its construction with little to no direct investment from McKesson.

40.    Drafted based on this fundamental understanding, the PPA denominates Robin MCK as the "Owner" of the electricity generated by the SEF.

41.    As "Owner" of the electricity generated by the system, Robin MCK sells the power produced by the SEF to its sole customer, McKesson, who was denominated the "Purchaser" in the PPA.  A true and correct copy of the PPA is attached hereto as **Exhibit 1**.[1]

42.    In exchange for agreeing to bear all the costs of installing this massive project to produce electricity solely for McKesson's Warehouse for a period of over 30 years, McKesson agreed to purchase all of the electricity produced by the SEF from Robin MCK.

---

[1] Unless otherwise stated, all citations to the PPA shall refer to Exhibit C of the PPA, which contains the "General Terms and Conditions."

43.    Specifically, the PPA defines an "Initial Term" of twenty (20) years, beginning on the "Commercial Operation Date," which occurred on April 1, 2022, followed by "[o]ne automatic 5 year extension" and "up to five automatic 1 year extensions thereafter."  PPA Ex. A §§ 1, 2.

44.    Accordingly, the Term presumptively continues for the combined total of 30 years unless either party proactively takes action to terminate the PPA or opt out of the automatic extensions.  PPA § 3; *see also* Lease § 4(a).

45.    To terminate the PPA after the 20-year initial term, but prior to the 10 years of combined automatic extensions, the parties were required to provide written notice at least 30 days prior to the end of the Term or extension periods. PPA § 3.

### 1.  Provisions in the PPA Related to Payment and Revenue Streams from the Energy Generated by the System

46.    Robin MCK's capital investment under the PPA was front-loaded and the cost of installing the SEF on the Premises built to last 30 years exceeded $10 million.

47.    In contrast, its benefits under the PPA, and its return on investment, were spread throughout a (i) a 20-year initial term and (ii) an additional, automatic, self-executing, extended term totaling 10 years, which could only be declined by a party upon 30 days' written notice before its automatic renewal.  PPA §§ 2(a)(i), 3, Ex. A.

48.    To provide the necessary return on Robin MCK's investments, the PPA contains two distinct revenue streams for energy generated by the System:

    i.    Cash payments by McKesson for the electrical energy the System produces; and

    ii.   Environmental and tax incentives for energy generated by the System.

49.    The cash payments to Robin MCK are governed by Section 4(b) of the PPA.

50.    That section requires McKesson to pay for generated electricity within forty-five (45) days of receipt of the invoice.

51.    If McKesson fails to timely pay these invoices, even for estimated energy output, within this timeline, interest will accrue as described in Section 4(b) of the PPA.

52.    For the second revenue stream, the System generated sufficient solar energy to qualify for environmental and tax incentives, which can be sold on a secondary market.

53.    To memorialize Robin MCK's right to use the System to collect on these environmental and tax incentives, Section 5 of the PPA granted Robin MCK sole ownership, free and clear of any claim of ownership by McKesson, over "(a) all Environmental Incentives, (b) all Environmental Attributes and (c) the Reporting Rights, in each case that currently exist or as may become available due to any change in Law."

54.    Environmental Attributes include "any and all credits, benefits, emissions reductions, offsets, and allowances, howsoever titled, attributable to System, the generation of electrical energy from the System, and its displacement of conventional Energy generation."  PPA § 5.  Environmental Attributes expressly include the Renewable Energy Credits ("RECs") issued by the United States Government that Robin MCK receives for each megawatt-hour of electricity the System generates and delivers to the electricity grid.

55.    Independent of RECs, Environmental Incentives include various tax credits, rebates, subsidies, and other financial or tax incentives attributable to the System or the energy it produces.  PPA § 5.

56.    As McKesson is aware, Robin MCK made commitments to sell RECs to the public.

57.    This included its participation in New Jersey's Transition Renewable Energy Credit program and the consistent accrual of RECs for sale to other third parties.

58.    Additionally, Robin MCK obtained funding from banks and investors to construct the SEF, in reliance on its continued eligibility for certain production tax credits.

59.    Specifically, Robin MCK granted interests ("Tax Equity") in the Environmental Incentives to certain of its financing parties, who would receive returns on their investment in the form of tax credits, once Robin MCK qualified to receive them.

60.    The continued accrual and value of these Environmental Attributes and Environmental Incentives was a material assumption underlying the PPA and a material inducement for Robin MCK to enter into the Agreements, as evidenced by the parties' agreement to certain contingencies and estoppels for the express purpose of preserving them.  *See, e.g.*, PPA § 11; Estoppel Certificate.

61.    At the time it entered into the PPA, McKesson was aware that Robin MCK had made commitments to sell RECs and tax incentives and that the loss of these tax incentives through a termination of the Agreement would, among other things, result in a tax recapture by the United States Government that would likely result in a cost to accrue of $2,600,000.

**2.    The Bargained-for Protection in the PPA of
Greenbacker's Investment in the Form of Monetary Remedies
for Unscheduled and Prolonged Outages Not Attributable to Robin MCK**

62.    To achieve its sustainability initiatives, McKesson needed a certain amount of renewable energy, while Robin MCK needed assurances that the SEF would remain in operation.

63.    Accordingly, Robin MCK agreed to provide certain output guarantees to McKesson, and McKesson agreed to strict provisions against the non-operation of the SEF during daylight hours when the sun would supply energy to the System. PPA §§ 7(g), 8(f).

64.    The PPA only allowed McKesson to schedule the SEF to be offline for a total of forty-eight (48) daylight hours between 9:00 am. and 3:00 pm local time each calendar year (each period a "Scheduled Outage").  PPA § 8(f)(i).

65.     During these Scheduled Outages, McKesson would not have the obligation to accept or pay for the electrical energy produced by the SEF, provided that McKesson provided Robin MCK at least forty-eight (48) hours advance notice of the Scheduled Outage. *Id.*

66.     But under Section 8(f)(iii) of the PPA, for any Scheduled Outage lasting longer than forty-eight (48) daylight hours and for any unscheduled outages (*i.e.* those that did not provide Robin MCK with proper advance notice), which outages were "not attributable to [Robin MCK]," the PPA provides for compensation to Robin MCK as follows:

> [Robin MCK] shall reasonably estimate the amount of Energy Output that would have been delivered to [McKesson] during each hour of such excess Scheduled Outages or unscheduled outages and [McKesson] shall pay [Robin MCK] for such amount plus any lost Environmental Attributes or Environmental Incentives that [Robin MCK] or its designees would have received in the absence of such outage, which shall be payable in accordance with [the terms of the PPA].

67.     In other words, whenever the System or any portion thereof is not operational due to no fault of Robin MCK, McKesson must pay Robin MCK the full value of the power that would have been produced, including the value of the RECs and tax incentives that were lost during the outage period.

### 3. Robin MCK's Investment Is Further Protected by Broad and Exclusive Repair Rights to Ensure Continued Operation of the SEF

68.     In the event of damage to the SEF, the PPA granted broad rights to Robin MCK to repair the SEF to ensure its long-term operation and allow Robin MCK to recoup its initial investment.

69.     Section 9(b) provides that in the event of damage to the SEF, Robin MCK "shall have the right, *in its sole discretion*, to repair or replace the System or terminate the PPA" and the PPA will then "remain in full force and effect." PPA § 9(b) (emphasis added).

70.     Similarly, if any damage to the Premises inhibits McKesson from accepting the Energy Output, the PPA obligates McKesson to "promptly repair and restore the Premises to its pre-existing condition" so that it can accept (and pay for) the energy output.  PPA § 9(c).

71.     Because Robin MCK has the exclusive right to dictate whether to reenergize and repair the SEF when it is damaged, Robin MCK agreed, at its own cost and expense, to design, operate, and maintain the SEF in good condition and repair and in accordance with applicable laws.  PPA § 7(a).

72.     To balance out the responsibility undertaken by Robin MCK to bear the costs for repairing the SEF when it is damaged, McKesson agreed to maintain the building and premises in good repair so as not to interfere with Robin MCK's operation and maintenance of the SEF.  PPA § 8(c)(i).

73.     These requirements highlight the importance to the parties of keeping the SEF operational so that Robin MCK could realize return on its significant up-front investment.

74.     Notably, nothing in the PPA grants McKesson the ability to refuse to allow Robin MCK to operate any portion of the SEF.

### 4.  To Protect Robin MCK's Investment, the PPA Curtailed McKesson's Ability to Terminate the PPA

75.     McKesson also agreed to limit its ability to terminate the PPA before the end of the initial term or its automatic extension periods.

76.     Section 3 of the PPA contains a provision allowing for the possibility for McKesson to terminate the PPA "for its own convenience and without cause."

77.     But McKesson cannot exercise this right under Section 3 unless, at a minimum: (1) McKesson provides Robin MCK with thirty (30) days' advance notice of termination; (2) McKesson pays the Termination Payment (as defined in the PPA) and all other costs accrued

but unpaid as of the termination date; and (3) **McKesson "otherwise complies with the provisions set forth in this PPA**."

78.    Accordingly, McKesson is unable to terminate the Agreements if it is in default of its obligations to comply with the provisions set forth in the PPA.

79.    Defaults, or examples of non-compliance with the PPA are enumerated in Section 13(a) of the PPA.  Events of default include the following:

> (i)    [F]ailure to make, when due, any payment required under this PPA if such failure is not remedied within ten (10) days after receipt of written notice from the other Party (the "Non-Defaulting Party"). . . .
>
> (iii)    [F]ailure to perform any material covenant or obligation set forth in this PPA (except to the extent constituting a separate Event of Default), if such failure is not remedied within 30 days after receipt of written notice from the Non-Defaulting Party . . . .
>
> (viii)    [Any] "Event of Default" under the Lease. . . .
>
> (x)    [If Robin MCK] loses the right to access the Premises or operate the System at the Premises for any reason. . . .

80.    Section 13(b) of the PPA does not obligate any Party to elect a specific remedy when there is an Event of Default, stating:

> If at any time an Event of Default has occurred and is continuing, the Non-Defaulting Party may pursue applicable remedies or damages at law or equity, can suspend performance under this PPA (except in the event of a payment default pursuant to Section 13(a)(i), and, with notice to the Defaulting Party, terminate this PPA (the date of such notice, an "Early Termination Date").

81.    However, a non-defaulting party is "under no obligation to prioritize the order with respect to which it exercises any one or more rights and remedies available under this PPA," which "are cumulative with the other rights and remedies available . . . at law or in equity."  PPA § 13(f).

82.     In short, if McKesson defaults, Robin MCK is free to elect whichever remedy it chooses at whatever time it chooses, and McKesson is barred from terminating the PPA for convenience and without cause.

**C.     Robin MCK Enters Into the Lease to
         Guarantee that Robin MCK Has Access to the SEF to
         <u>Ensure the SEF's Continued Operation Without Interference from McKesson</u>**

**1.   The Lease Granted Robin MCK Broad Access Rights To Operate the SEF**

83.     On October 17, 2018, Robin MCK[2] and McKesson entered into the Lease to complement the provisions of the PPA.

84.     The Lease is substantially coterminous with the PPA, meaning that its term is similar and a default under the Lease constitutes a default under the PPA.  *See* Lease § 4(a).  A true and correct copy of the Lease is attached hereto as **Exhibit 2**

85.     The Lease sets forth the siting of the SEF on the roof of the warehouse and on the Premises and details the parties' respective obligations, including Robin MCK's rights to access the Property to carry out its responsibilities under the PPA with respect to the SEF.

86.     Among other things, as part of this access to the parts of the Premises containing the System, the Lease imposes a clear and unambiguous obligation on McKesson to provide Robin MCK with access to the Premises to perform any required repairs to the System in the event of an outage.

87.     For example, the Lease grants Robin MCK access to "each part" of the Premises, including the 237,000 square feet of rooftop space on the Warehouse and 134,000 square feet of other space reserved for the System, for "all purposes and activities in any way related, connected

---

[2] In the time between the execution of the PPA and the execution of the Lease, NRG caused NRG Robin MCK, LLC to change its name to its present name of "Robin MCK, LLC."

or necessary to . . . installation, construction, operation, interconnection, use, maintenance, repair and removal of" the System.  *See* Lease § 2(a)(ii), (a)(iv), (b)(ii).

88.     Likewise, Section 10 grants Robin MCK the right to access the Premises for several enumerated purposes, including: "(i) to install, interconnect and operate the SEF on the Premises; (ii) to maintain, clean, repair, replace and dispose of part or all of the SEF; . . . and (vi) to perform (or cause to be performed) all tasks necessary or appropriate, *as reasonably determined by [Robin MCK]*, to carry out the activities set forth in this Lease."  Lease § 10 (emphasis added).

89.     Pursuant to the Lease, the purposes and permitted uses of the Premises included "construction, installation, interconnection, operation, maintenance, repair, improvement, replacement and removal of the SEF and uses incidental thereto as well as all purposes set forth in the PP A and all pursuant to the Approved SEF Plans and Specs" ("Permitted Use").  Lease § 6(a).

90.     To protect the operation of the SEF, McKesson agreed that it would not exercise its rights in a matter that would "materially interfere" with Robin MCK's rights and further "covenant[ed] that [Robin MCK] shall peaceably and quietly have, hold and enjoy its leasehold interest in the Premises during the Lease Term for its Permitted Use of the Premises in accordance with the PPA."  Lease §§ 2(f), 6(f).

91.     In furtherance of the goal of ensuring the continued operation of the SEF, the parties mutually agreed to keep and maintain their respective property in good repair and condition.

92.     For example, Robin MCK agreed to keep the SEF in good working order.  Lease § 9(a).

93.     Similarly, McKesson agreed that it would maintain the Premises and the Warehouse, and all Warehouse systems (including but not limited to the HVAC systems) in "good operating condition and repair."  Lease § 9(b).

**2.    The Lease Also Granted To
       Robin MCK Exclusive Discretion to Repair the SEF After a Casualty Event**

94.    To ensure that the Premises are maintained in good repair following a fire or other casualty, Section 14(a) of the Lease imposes certain repair obligations, stating that if the Premises or the Warehouse suffer damage in a fire or other casualty, and McKesson elects to rebuild or restore same, the McKesson "shall promptly, at its expense, repair and restore the Premises and the [Warehouse] (but not the SEF) to substantially their former condition and this Lease shall remain in full force and effect."

95.    If any repairs require removal of the SEF, Robin MCK, "at [McKesson]'s sole cost and expense," shall remove the SEF to allow the restoration or repairs, and then Robin MCK "at [McKesson]'s sole cost and expense," shall promptly reinstall the SEF upon completion of the restoration or repairs.  Lease § 14(a).

96.    In the event that a fire or casualty destroys all or a substantial part of the Premises or Warehouse, thereby rendering it unsuitable for operation of the SEF "as reasonably determined by [Robin MCK]," Robin MCK (not McKesson) can, at its option, either terminate or continue the Lease.  The Lease does not contain grant any corresponding right to McKesson. If Robin MCK elects to continue the Lease, McKesson "shall exercise commercially reasonable efforts to return the Premises (other than the SEF) to substantially its former condition prior to such damage and this Lease shall remain in full force and effect."  Lease § 14(b).

97.    The Lease defines an Event of Default to include any Event of Default under the PPA, as well as "the failure to perform any covenant or obligation set forth in this Lease if such failure is not remedied within thirty (30) days, or such other time period as may be specifically provided, after receipt of written notice . . . ."  Lease § 12(b), (c).

98.     Even if McKesson defaulted under the Lease and failed to cure, Robin MCK may continue the Lease for so long as the Event of Default exists and may "extend the Lease Term and maintain the SEF at the Premises in accordance with the terms of this Lease until the 30th anniversary of the Commercial Operation Date (i.e. the expiration date of the Term)." Lease § 4(a).

99.     In other words, the parties expressly understood the Term of the Agreements to run through the last extension period, i.e., thirty (30) years after the start of the initial term.

100.    Notably, there is no provision in the Lease that would allow McKesson to refuse to allow Robin MCK to operate a portion of its SEF or to terminate the Lease or PPA when the SEF is repairable.

**D.      McKesson Signed Estoppels that Confirmed that It Had
          No Basis to Terminate the PPA When Greenbacker Bought Robin MCK from NRG.**

101.    On February 7, 2019, prior to Robin MCK building the System, Greenbacker and NRG entered into that certain Membership Interest Purchase Agreement (the "MIPA").

102.    Pursuant to the MIPA, Greenbacker purchased from NRG, among other things, 100% of the ownership interests in Robin MCK and its rights and obligations under the PPA and the Lease.

103.    Schedule 3.2(j) to the MIPA identified various closing deliverables in connection with each of the sales contemplated therein.

104.    Among these was an "[e]stoppel executed by McKesson Corporation," substantially in the form attached to the MIPA.

105.    On April 30, 2019, McKesson executed an estoppel (the "Estoppel") in favor of Robin MCK and Greenbacker, in connection with the PPA, the Lease, and the MIPA.

106.    In the Estoppel, McKesson certified a number of statements relating to the Agreements.  Specifically, McKesson acknowledged that Greenbacker and NRG would rely on

those statements and acknowledged that it was estopped from making any assertions contrary to those contained in the estoppels.  A true and correct copy of the Estoppel is attached hereto as **Exhibit 3**.

107.    Notably, in section 7(c) of the Estoppel, McKesson certified that, "no known facts exist entitling [McKesson] to any ability to terminate the [PPA] or the Lease or any claim, counterclaim, offset or defense against [Robin MCK] in respect of the [PPA] or the Lease."

108.    The Estoppel was a material deliverable in the MIPA, and Greenbacker would not have consummated the MIPA without McKesson's affirmation that some additional event would need to occur to allow McKesson to terminate either or both of the Agreements, i.e., that McKesson could not just terminate the Agreements at will.

109.    If the PPA included a broad termination for convenience and without cause clause that granted McKesson the unfettered discretion to terminate the PPA at will, then McKesson could not have certified that it was not entitled to any such ability to terminate on April 30, 2019.

**E.    McKesson Uses a July 22, 2023 Fire In Its Own HVAC Unit
As a False Pretext to Disparage Robin MCK's System and to Attempt
to Force Robin MCK Out of the Property at a Bargain Basement Price**

110.    Between 2018 and the Commercial Operation Date of April 1, 2022, Robin MCK expended more than $10 million installing and activating the SEF just as it had promised it would in the PPA.

111.    For 15 months after the Commercial Operation Date, the SEF produced power for the Warehouse.

112.    Robin MCK invoiced McKesson for the power and McKesson paid Robin MCK as invoiced.

113.    Likewise, the SEF generated RECs that Robin MCK could use to begin recouping its substantial investment in the SEF, through sale and participation in, among other things, the state's Transition Renewable Energy Credit program.

114.    However, this partnership began to unravel on July 22, 2023 at 4:36 p.m. when a fire, described in much of the correspondence as a "thermal event," started in the Warehouse's HVAC system ("the Fire").

115.    According to witnesses, the July 22, 2023 fire burned long enough and hot enough to create a black column of smoke that grew large enough to be visible from the outside of the Premises.

116.    After seeing the large column of black smoke, these witnesses reported a fire to the Robbinsville Township Fire Department (the "RTFD").

117.    After receiving reports of a visible column of black smoke – indicating an already burning fire – the RTFD, including Investigator and Fire Official Brian F. Johnson, responded to the reports of heavy black smoke at *5:05 p.m.*, well after the Fire had started.

118.    This timeline is not simply Robin MCK's position – the RFTD's investigation and fire report confirm this.

**1.    RFTD'S Investigation Concluded that the Fire Began in McKesson's HVAC Unit**

119.    Upon arrival at the Warehouse, RTFD officials found a fully developed fire and proceeded to contain it.  Thereafter, the RTFD investigated the Fire's cause and origin.

120.    On August 1, 2023, Officer Johnson prepared a report to document the RTFD's findings from its investigation on the roof the day of the Fire (the "RTFD Report").

121.    The RTFD Report pinpointed the start time of the Fire and its point of origin.

122.    The RTFD provides in pertinent part as follows:

> All the evidence collected, data retrieved, and photos taken show that *a fire originated in the HVAC unit at some point around or on 4:36 on this day*.  We can prove there was a fire on the inside of the HVAC unit but do not have the technology to determine what part or portion of the unit failed first and when.

123.    Having concluded that the Fire started in the HVAC Unit at 4:36 P.M., the RTFD endeavored to understand what role, if any, the System had in the Fire.

124.    Officer Johnson and other RTFD personnel observed that they expected the System to be "equipped with the recording data collection that could tell us either by certain solar panel or solar array by section when the solar started to drop out and or fail and at what time."

125.    However, the officers noted that, "We also do not have the data from the solar, due to the lack of cooperation on behalf of McKesson Corporation."

126.    The data that the RTFD requested would ultimately surface weeks later, in spite of McKesson's failure to provide it when requested.

127.    It too would point to the HVAC unit as the cause of the Fire.

**2.  Robin MCK's Insurers Investigate and Confirm That the Fire Originated in the HVAC System and Was Not Attributable to the SEF**

128.    On August 21, 2023, representatives from Robin MCK's insurance company visited the roof of the Warehouse to investigate the Fire's root cause.

129.    The inspection by Robin MCK's insurance company uncovered additional physical evidence that the cause of the Fire was within the HVAC Unit.

130.    Upon investigating the HVAC Unit, the insurance inspector discovered distinctive burn marks on a specific component inside the HVAC Unit.

131.    This component showed charring indicative of the Fire's ignition point, and a burn pattern spreading out from that ignition point.

132.    The portion of the HVAC Unit that caught fire had been sitting on wooden 2x4 planks.

133.    The burn pattern shows widespread charring of the 2x4s immediately below the HVAC Unit, with smaller charred sections reaching the roof, indicating that the fire started in the HVAC Unit and then spread along the wooden 2x4s to the roof.

134.    According to these inspectors, had the fire started elsewhere, the burn pattern would have been reversed, with widespread charring where the 2x4s met the roof, which would then diminish as the fire attempted to burn up to the HVAC Unit. Instead, the heaviest charring is under the HVAC Unit, which would not have been charred to such a degree unless the fire started within the HVAC Unit.

135.    The fire investigators additionally noted that the solar panels were designed not to propagate a fire and would more likely melt rather than catch fire.

136.    The solar panels themselves are not flammable and their wires have outside protective sheathing.

137.    Once the active flame was removed from the panels, the panels would cease melting.

138.    The photographs of the damaged solar panels confirm that the panels did not propagate the fire, as the photos demonstrate that numerous panels were half melted, but the other half remained intact.

139.    Robin MCK's fire investigators also noted that the arc pattern, which is indicative of where the fire started, was within one foot of the HVAC Unit, with another indicator that the fire began within the HVAC Unit.

140.     Finally, the fire investigators concluded that the source of the fire was most likely a mechanical failure related to the gas supply to the HVAC Unit because the design of the roof would have required a high-intensity flame to ignite a fire.

141.     Neither the electrical systems of the HVAC Unit nor the SEF could have generated sufficient prolonged heat that would have been necessary to ignite the roofing material.

142.     The only likely cause of the fire, which is consistent with the arc pattern and char pattern, is that the gas supply to the HVAC Unit ignited, causing the fire.

### 3.     Robin MCK's Sensor Data from the SEF Adduces Additional Evidence That the Fire Originated in the HVAC Unit

143.     Though McKesson initially delayed allowing Robin MCK to reconnect to its sensors, Robin MCK was also eventually able to retrieve sensor data from the SEF.

144.     That data confirms that the SEF was a victim of the already burning fire and not the cause of it.

145.     The sensor data shows that the SEF's solar panel units began to lose production at 5:05 p.m. on July 22, 2023—at which point the Fire within the HVAC Unit had become so severe that the column of black smoke was already visible to witnesses, those witnesses had already reported an active fire to RTFD, and RTFD had already dispatched teams of firefighters to contain it.

146.     The data further shows that communication with other sections began to fail at 5:15 p.m., more than 39 minutes after the Fire began in the HVAC Unit at 4:36 p.m.

147.     Had the fire started within the rooftop mounted SEF, the data from the SEF would have shown a drop in voltage long before smoke was visibly observed. Instead, and unsurprisingly, the sensor data confirms RTFD's conclusion that the fire started well before 5:00p.m. on July 22nd

somewhere other than in the SEF, which was working without disruption until it was impacted when the fire that ignited in the HVAC Unit finally reached it.

**F.    McKesson Obstructs Robin MCK from Accessing the Premises for Months, Breaches Its Obligation to Permit Robin MCK to Reenergize the SEF, and Fails to <u>Adduce Any Evidence to Rebut the Findings Attributing the Fire to the HVAC Unit</u>**

### 1. McKesson's Delay Tactics

148.    Immediately after the Fire on July 22, 2023, McKesson shut down the entire System, including the unaffected panels on the ground, thereby beginning an "unscheduled outage" in the System.

149.    Less than 48 hours after the Fire and continuing for the next month, Robin MCK repeatedly requested that McKesson grant it access to the Premises to make progress towards restoring and reenergizing the SEF

150.    These purposes included:

(i)    continued testing and inspections of the unaffected equipment;

(ii)    restoring power to sensors and data acquisition equipment in order to monitor the System;

(iii)    reenergizing the ground portion of the System; and

(iv)    isolating the undamaged portion System on the roof and returning the rooftop arrays that did not experience thermal damage to production.

151.    McKesson originally did not respond to or acknowledge Robin MCK's requests for access.

152.    Later, McKesson's employees engaged in further delays, claiming not to know who was responsible for working with Robin MCK on gaining access.

153.    By August 23, 2023, a month after the fire, Robin MCK had not received access to the rooftop despite McKesson's obligations under the Lease to grant Robin MCK such access.

154.    Thus, by letter dated August 23, 2023 (the "August 23 Letter") Robin MCK's Chief Operating Officer, Matthew Murphy, wrote to McKesson's "SVP and Global Head of Real Estate" to explain that Robin MCK sought access to the Premises for the reasons noted *supra* and because re-energization of the System is critical to Robin MCK's requirement under its insurance policy to "mitigate the loss."

155.    Absent the requested access, Robin MCK would be unable to fulfill its obligations, including those of mitigation and would risk the loss of vital insurance coverage.

156.    The August 23 Letter further notified McKesson "restrict[ing Robin MCK] from accessing the Rooftop Space and such denial of access is in contradiction to the terms of the Lease."

157.    By letter dated September 8, 2023 (the "September 8 Letter"), McKesson's VP and GM of Global Real Estate, Frank Cuevas, finally responded to Robin MCK's August 23 Letter.

158.    The September 8 Letter omitted any mention of the RTFD Report's findings that all of the available evidence showed that the Fire originated in the HVAC Unit.

159.    Obviously seeking to delay efforts to reenergize the SEF, McKesson falsely denied in the September 8 Letter that Robin MCK had made any requests to access the Warehouse roof and the SEF, other than its insurance company's requests seeking to investigate the cause of the Fire.

160.    In yet another effort to blame-shift and delay, the September 8 Letter further misstated that Robin MCK had withheld data from the SEF concerning the time that it first recorded the effects of the Fire—ignoring that it was McKesson's own obstruction that prevented Robin MCK from accessing its data.

161.    Further evidencing the bad faith attempt by McKesson to delay and sidestep its obligation under the Agreements to allow Robin MCK to repair and reenergize the SEF, the September 8 Letter foreshadowed that even if the SEF data ruled out the SEF as the cause of the Fire, McKesson would not provide access the access requested to repair and reenergize the SEF.

162.    The September 8 Letter states that once the "parties can confirm there was no issue with the operation of the solar panels, we can then *revisit* reenergization of the *remaining operational solar panels.*"

163.    The September 8 Letter disclosed that McKesson's insurance company was investigating the cause of the Fire.

164.    But McKesson did not and still has not, to date, offered any insight into its own insurance company's investigation or findings.

165.    But Robin MCK did.

**2.    Robin MCK's Good Faith Efforts to Share
        Information and McKesson's Continued Delay Tactics**

166.    On October 2, 2023, Robin MCK participated in a conference call with representatives from McKesson and shared its evidence indicating that the Fire did not originate in the System.

167.    Hoping to cooperate in reaching a solution that would allow it to exercise its right under the PPA to repair and reenergize the SEF, Robin MCK maintained contact with McKesson and continued to request access and propose meetings to discuss this issue through October.

168.    Though Robin MCK attempted to continue the discussion regarding investigation, mitigation, and repair, McKesson's engaged in further delay.

169.    On October 10, 2023, Robin MCK emailed McKesson, through its legal department, requesting another meeting.

170.    No meeting occurred for three weeks.

171.    On October 31, 2023, Robin MCK participated in a teleconference and again presented its analysis showing that the rooftop HVAC Unit had caused the fire, based on the timing of alarm data from the HVAC system and the SEF, as well as the insurance company inspector's analysis of the burn patterns on the roof showing that the fire originated from a component of the HVAC Unit that was set atop wooden 2x4s that showed charring and a pattern of outward spread.

172.    Additionally, Robin MCK, reiterated that it had not been able to access and inventory its damaged equipment in order to reconstruct the fire, advance its property insurance claims to its lost equipment, and to collect even more evidence that the fire originated from the HVAC Unit and not the SEF.

173.    Robin MCK again requested roof access to inspect the remaining portions of the System on the roof.

174.    Robin MCK explained that access was necessary for it to compile an inventory of the damaged equipment and inspect the condition of remaining System components, which would in turn allow it to plan for future repairs and re-energization.

175.    Robin MCK additionally requested that McKesson include it in any subrogation efforts against the HVAC installer and/or manufacturer.

176.    Once again, McKesson declined to furnish any evidence regarding the cause and origin of the Fire resulting from its own investigation or the investigation of its insurer.

177.    McKesson responded that despite the fact that the sole evidence adduced to date was that the Fire started in the HVAC Unit, no subrogation was planned to pursue the manufacturers of the HVAC Unit.

G.    **McKesson Spoliates Evidence And Continues to**
      **Obstruct Robin MCK's Efforts to Reenergize the System**

1.  **McKesson Threw Crucial Evidence in a Dumpster**

178.    McKesson misrepresented to Robin MCK that the evidence was being preserved.

179.    On November 17, 2023, the parties participated in yet another telephone conference, this time with Robin MCK's insurer's fire investigators.

180.    The only lawyers appearing for McKesson were its in-house litigators and no one attended who had expertise in the causation of fires to discuss causes of the Fire that might be related to the SEF.

181.    During this meeting, the fire investigators for Robin MCK's insurers explained their findings directly to McKesson's representatives.

182.    McKesson offered no information to rebut the findings of Robin MCK's fire experts.

183.    Also at the November 17, 2023, meeting, and contrary to its previous representations that the evidence from the Fire was "preserved," McKesson finally disclosed that all evidence had been placed in a dumpster on the Premises.

184.    The condition of the materials in the dumpster suggests that McKesson merely threw the fire-damaged solar panels off the roof.

185.    There was no attempt to identify the individual panels or to otherwise mark where these panels had been located on the roof.

186.    This prevented, and forever prevents and prejudices, Robin MCK's fire experts from reconstructing the damaged rooftop to investigate how the fire spread through the system.

187.    Robin MCK's fire experts clarified that the "damaged equipment they [had] viewed was mixed up, without labeling, so it would be impossible to reconstruct."



### 2. Robin MCK Continues to Share Critical Information While McKesson Continues to Deflect

188.    At a meeting on November 17, 2023, counsel to McKesson inquired as to how Robin MCK verified the timestamps in the data it had recovered from the System marking failures during the fire.

189.    Robin MCK immediately provided a transparent answer: its clocks were synchronized with the United States Government's atomic clock through the internet and maintained global timekeeping accuracy.

190.    McKesson did not raise any concerns about its own system's ability to keep accurate time at this meeting.

191.    Once again, even though McKesson's own insurers purportedly investigated the cause of the Fire, McKesson did not disclose the results of any of its own investigation or analysis of the Fire's root cause.

192.    On December 20, 2023, McKesson finally proposed a date for the site visit – January 4, 2024.

193.    On January 4, 2024, after almost six months of obstruction by McKesson, Robin MCK finally accessed the rooftop System.

194.    In a follow-up call on January 12, 2024, McKesson advised Robin MCK that it would not allow the rooftop System to be reenergized without proof that the SEF did not cause the Fire.

195.    But McKesson refused to offer any indication of what evidence would satisfy its concerns in order to allow Robin MCK to reenergize the rooftop System, it did not offer the conclusions of its own insurer that anything other than the HVAC Unit was responsible for the Fire, nor did it attempt to address or rebut in any way the mountain of evidence that the HVAC Unit caused the Fire.

196.    McKesson followed up on the January 12, 2024 conference call with an email sent on January 17, 2024 (the "January 17 Email").

197.    The January 17 Email made clear that McKesson had no intention or timeline for allowing Robin MCK to reenergize the solar panels on the rooftop nor was there any realistic possibility that McKesson would ever do so.

198.    Despite the overwhelming evidence exclusively pointing to the HVAC Unit as the source of the fire and without sharing the results of the investigation conducted by its own insurance company, McKesson still claimed that it "still [did] not have sufficient evidence and assurance that the fire was caused by the HVAC as opposed to the solar panels."

199.    Instead of offering any expert analysis or investigation of its own to substantiate its concerns, McKesson contrived yet another unsubstantiated false narrative about the cause of the fire.

200.    This time, McKesson claimed that the time stamp of the alarm system monitoring the HVAC Unit was incorrect and was, in fact, behind by 34 minutes:

> I noted the time stamp on the monitoring system of the HVAC system was incorrect. I confirmed the time stamp is behind by 34 minutes. The system indicated the HVAC's functionality was impacted at 4:46pm EST, but in actuality that should be 5:20pm EST. We understand that was after the functionality of the solar panels was impacted.

201.    McKesson did not provide any explanation or evidence for why this alleged discrepancy might have occurred, how it could have occurred given that each and every other system with a time stamp is connected to the internet and time-synced, how it learned of the alleged error, or why it had not been previously disclosed to Robin MCK in the six months since the Fire.

202.    McKesson also did not explain the origin of the 4:46 p.m. timestamp, when the RTFD Report had indicated the HVAC alarm had triggered at 4:36 p.m. and did not even attempt to explain how this revised timeline squared with RTFD having been called out to the Premises after reports of a fire with billowing black smoke at 5:05 p.m.

203.    Yet this false narrative about time stamps was not the only indication in the January 17, 2024 email that McKesson had no intention of ever allowing Robin MCK to repair and reenergize the SEF.

204.    In the January 17 email, McKesson asserted that "[i]f in fact the HVAC caused the fire, then [Robin MCK] should not want to continue to operate its solar panels on the roof."

205.    In other words, according to McKesson, if the HVAC Unit presented a fire hazard, then Robin MCK should abandon the SEF rather than exercise its bargained for rights for McKesson to keep the HVAC Unit in good repair and reasonably free of the risk of fires.

206.    In sum, McKesson sought to have Robin MCK abandon its multimillion-dollar investment in the SEF, before it recouped even its initial investment, much less began making a profit.

207.    At the same time, McKesson, with no financial investment in the SEF, would have made superficial progress on its alleged goals to decrease its environmental footprint.

**H.    McKesson Continues to Obstruct Robin MCK
from Exercising Its Bargained for Rights to Reenergize
the Rooftop System or to Collect the Contractually Mandated Outage Fees.**

208.    In a letter dated February 7, 2024 (the "February 7 Letter"), Robin MCK reminded McKesson that "the inability to reenergize the rooftop portion of the System will result in a substantial loss of revenue to [Robin MCK] and thus represents a significant financial burden."

209.    Robin MCK then notified McKesson of its belief that this "represent[ed] a default under the Agreements and [was] not warranted by the facts established by [its] investigation into the event, which [Robin MCK had] previously shared with [McKesson]."

210.    In the February 7 Letter, Robin MCK reiterated its interest in pursuing an amicable business solution and requested an additional meeting to discuss.

211.    To date, while McKesson has permitted reenergization of the ground units, it has steadfastly refused to allow Robin MCK to reenergize the portion of the System on the Warehouse roof.

212.    McKesson has similarly steadfastly refused to pay for the impact of this prolonged outage, as it is obligated to do pursuant to the express terms of the Agreements.

213.    The parties bargained for and agreed to terms requiring full payment to Robin MCK in the event of any outage at the Premises not attributable to Robin MCK, but, to date, McKesson has not made any outage-related payments to Robin MCK.

214.    By refusing to allow Robin MCK access to the Premises to repair and reenergize the System and declining to furnish Robin MCK with evidence from the HVAC system procurement and installation, McKesson also materially interfered with Robin MCK's ability to recover under its insurance policy covering the System or to proceed with subrogation actions against the HVAC manufacturer for damages from the Fire.

I.    **McKesson's Disparagement of the System**
      **Damages Robin MCK's Relationships with Its Investors**

215.    Because McKesson asserted that the System caused the fire and refused to allow Robin MCK to reenergize the rooftop portion of the System, Robin MCK was forced to disclose these allegations to its investors.

216.    Robin MCK and Greenbacker were forced to make these disclosures even though McKesson, to date, has failed to offer any evidence or expert analysis to demonstrate that the System, in anyway whatsoever, caused or contributed to the fire.

217.    Prior to these disclosures, investment in Robin MCK's and Greenbacker's renewable energy projects had been steady.

218.    However, since Robin MCK was forced to disclose McKesson's allegations that its System caused a fire at McKesson's Building, Robin MCK and Greenbacker have seen a decrease in investment in their renewable energy projects.

219.    Furthermore, Robin MCK and Greenbacker have seen a decrease in interest from institutional lenders, causing Robin MCK and Greenbacker to incur higher borrowing costs for their projects.

220.    Absent the false, reckless, and disparaging statements from McKesson, Robin MCK would never have never had needed to disclose McKesson's allegations and therefore would not have incurred these damages, including damages to its investor relations.

**J.    The December 26 Notice of Breach**

221.    Despite McKesson's defaults and refusal to abide by the terms of the Agreements, Robin MCK has (unsuccessfully) attempted to amicably resolve this dispute without resorting to litigation.

222.    By letter to McKesson dated December 26, 2024, Robin MCK, through counsel, delivered a notice of default and demand for payment to McKesson (the "Demand Letter").

223.    In the Demand Letter, Robin MCK summarized the events described above and identified several breaches of the PPA and the Leases by McKesson, including:

(a) McKesson's refusal to grant access to the affected areas of the Premises to inspect, repair and reenergize the portion of the System located on the Warehouse's roof.

(b) McKesson's failure to fulfill its obligation to "maintain the Premises in a reasonable manner so as not to interfere with the . . . ownership, operation or maintenance or the System and otherwise consistent with [its] current and past practices." PPA § 8(c).

(c) McKesson's failure "to use commercially reasonable efforts not to materially interfere with [Robin MCK's] use and leasehold interest granted herein."

(d) McKesson's removal of the System's damaged solar panels and disposal of the same, without first documenting the condition of the equipment or the conditions of the roof.

(e) McKesson's material interference with Robin MCK's ability to recover under its insurance policy covering the System by preventing Robin MCK from mitigating its damages.

(f) McKesson's refusal to furnish Robin MCK with the documentation necessary for Robin MCK and/or its insurers to proceed with subrogation actions against Trane Technologies (the HVAC unit manufacturer) for damages Robin MCK incurred as a result of the HVAC fire.

224.    Robin MCK further notified McKesson that "refusing to reenergize the System and end the outage at any time—let alone refusing to reenergize and end the presently existing outage ever—is a separate, independent, and willful breach of the Agreements."

225.    Robin MCK attached two invoices amounting to $17,128,246.10 to the December 26 Letter.  These amounts were equal to:

i.    $777,017.24 representing the total estimated output of the System and the lost REC revenue up to and including November 30, 2024.

ii.    $8,743,419.64 representing the total estimated output of the System from December 1, 2024 until the end of the 35-year term of the PPA; and

iii.    $7,607,809.22 representing all of the environmental incentives lost to Robin MCK from July 23, 2023 until the end of the 35-year term, including the loss of the tax incentives and the environmental credits.

226.    To date, McKesson has refused to pay the Energy Output due to the continuing unscheduled outage, as is its obligation pursuant to the terms of the PPA.

227.    In addition to these direct costs, McKesson's delay irreparably damaged Robin MCK's relationship with its banks and investors. During the entire time that McKesson refused to

allow Robin MCK to reenergize its system, Robin MCK had contracted with certain investors to pay them the value associated with certain Environmental Incentives. However, McKesson's refusal to allow Robin MCK to reenergize the systems caused it to lose its tax incentives. Robin MCK's was therefore unable to fulfill these obligations, which resulted in banks and investors sending Robin MCK notices of default. However, had McKesson complied with the terms of the Agreements or immediately terminated for convenience and without cause, Robin MCK could have mitigated its obligations to its investors and banks.

**K.    McKesson's Unlawful Notice
Purporting to Terminate the PPA and the Lease
for "Convenience" Is Merely an Impermissible Attempt
to Avoid the Damages Caused by its Willful Breaches of the PPA and Lease**

228.    Recognizing the significant damage that its breach of the PPA and the Lease would cause, McKesson sought to sidestep its breach.

229.    By letter dated January 14, 2025, outside counsel for McKesson responded to the December 26 Letter purporting to terminate the PPA and the Lease for "convenience" pursuant to Section 3 of Exhibit C of the PPA.

230.    Outside counsel spoke by telephone on January 22, 2025.

231.    During that call, counsel for Robin MCK rejected McKesson's attempt to terminate the Agreements "for convenience," explaining that such a termination was contrary to the plain terms of the Agreements and California law (which governs interpretation of the PPA).  Counsel for Robin MCK reiterated this rejection by email on January 31, 2025.

232.    Thereafter, the parties participated in several discussions in an effort to resolve the dispute.

233.    By letter dated February 6, 2025, counsel for Robin MCK clearly explained, again, why McKesson's attempted termination for convenience violated the terms of the agreement writing:

> By its plain terms, Section 3 of the PPA would, at best, permit McKesson to terminate the PPA for "its own convenience and without cause," but only "so long as" McKesson "otherwise complies with the provisions of this PPA." In our December 26, 2024 letter to McKesson, Robin MCK identified numerous defaults by McKesson under the PPA and the Lease. Those defaults included, but were not limited to, McKesson's refusal to allow Robin MCK to access the rooftop System to repair the damages that were attributable to McKesson's defective HVAC system rather than to any condition caused by Robin MCK. Instead of complying with the PPA and the Lease, McKesson elected instead to intentionally repudiate its bargained-for obligations under the Agreements and asserted that it would never permit Robin MCK to reenergize the rooftop portion of the System. Because McKesson has not "otherwise complied with the provisions of the PPA," it cannot invoke the termination for convenience clause in Section 3 of the PPA, and its attempt to terminate the PPA and the Lease for convenience and without cause is null and void. . . Additionally, McKesson's improper attempt to terminate the PPA and the Lease for convenience constitutes yet another breach of the Agreements . . . .

234.    Outside counsel for Robin MCK has unsuccessfully attempted to negotiate a resolution of this matter with McKesson on several occasions.

## FIRST COUNT
## DECLARATORY JUDGMENT

235.    Robin MCK repeats and incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

236.    There currently exists an actual, present, and justiciable controversy between Robin MCK and McKesson regarding the rights of each of the parties under the Lease and the PPA.

237.    Pursuant to 28 U.S.C. § 2201, Robin MCK seeks a declaration stating the following:

(a) That McKesson's purported termination on January 14, 2025 is null and void and has no legal force and effect.

(b) That the PPA and the Lease remain valid and subsisting contracts between McKesson and Robin MCK.

(c) That McKesson must grant Robin MCK access to the roof of the Warehouse to repair, replace, maintain, reenergize and operate the SEF, and must not otherwise interfere with Robin MCK's rights to same.

(d) If McKesson fails to perform its obligations under the PPA and/or the Lease to permit Robin MCK to repair, reenergize, maintain, and operate the SEF, Robin MCK is entitled to all of the funds due under the PPA and the Lease for the entire 30-year term of same as if there had been a 30-year unscheduled outage.

**SECOND COUNT**
**BREACH OF CONTRACT (PPA AND LEASE)**

238.    Robin MCK repeats and incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

239.    The parties entered into contracts, specifically the PPA and Lease, containing certain terms and obligations.

240.    Robin MCK fully performed its obligations under the Lease and PPA.

241.    McKesson failed to perform its obligations under the Lease and PPA thereby breaching the Agreements.

242.    Specifically, McKesson breached the Agreements in the following ways:

i.   By failing to keep the HVAC system in "good operating condition and repair." Lease § 9(b).

ii. By preventing Robin MCK from accessing "each part" of the Premises "for all purposes and activities in any way related, connected or necessary to . . . installation, construction, operation, interconnection, use, maintenance, repair and removal of" the System.  Lease § 2(b)(ii).

iii. By interfering with Robin MCK's right "to maintain, clean, repair, replace and dispose of part or all of" the System and "to perform (or cause to be performed) all tasks necessary or appropriate, as reasonably determined by [Robin MCK], to carry out the activities set forth in this Lease." Lease § 10(ii), (vi).

iv. By preventing Robin MCK from repairing or replacing the System after the Fire, in violation of Section 9(b) of the PPA.

v. By failing to fulfill its obligation to "maintain the Premises in a reasonable manner so as not to interfere with the . . . ownership, operation or maintenance or the System and otherwise consistent with [its] current and past practices."  PPA § 8(c)(i).

vi. By failing "to use commercially reasonable efforts not to materially interfere with Lessee's use and leasehold interest granted herein."  Lease § 6(d).

vii. By failing to pay Robin MCK "for all unscheduled outages not attributable to [Robin MCK], [Robin MCK] shall reasonably estimate the amount of Energy Output that would have been delivered to [McKesson] during each hour of such excess Scheduled Outages or unscheduled outages and [McKesson] shall pay [Robin MCK] for such amount plus any lost Environmental Attributes or Environmental Incentives."  PPA § 8(f)(iii).

viii. By engaging in conduct which has impeded Robin MCK's insurance recovery, including by unilaterally removing and disposing of the System's

damaged equipment without first documenting the condition of the equipment or the conditions on the roof after the Fire, which could expose Robin MCK to claims of spoliation of evidence.

ix. By preventing Robin MCK from accessing the Premises to repair and reenergize the System, and thereby materially interfering with Robin MCK's ability to recover under its insurance policy covering the System.

x. By preventing Robin MCK from attempting to mitigate its losses by reenergizing the System, which its insurance policy requires it to do.

xi. By refusing to furnish Robin MCK with documentation of the Trane Technologies HVAC system procurement and installation, which is necessary for Robin MCK and/or its insurers to proceed with subrogation actions.

xii. By wrongfully terminating the Agreements.

xiii.    By improperly invoking the termination for convenience clause.

243.    Robin MCK further alleges that McKesson's breaches, or failure to do what the Agreements required, caused a loss to Robin MCK.

244.    Accordingly, Robin MCK hereby demands damages in amount to be determined at trial, but in no event less than $18,000,000.00.

**THIRD COUNT**
**SPECIFIC PERFORMANCE**

245.    Robin MCK repeats and incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

246.    Robin MCK seeks specific performance of McKesson's obligations under the Lease and PPA, namely, to allow Robin MCK access to the roof of the Warehouse to repair, replace, maintain, and operate the SEF.

247.    The PPA and Lease are both valid and subsisting contracts between McKesson and Robin MCK.

248.    The PPA and Lease are fair and equitable and are supported by adequate consideration.

249.    Robin MCK is ready and willing to fulfil all of its obligations under the Lease and the PPA.

250.    Robin MCK does not have an adequate remedy at law because:

    i.    The parties recognized in Section 6(e) of the Lease that interference with the SEF's ability to generate electricity (by affecting the SEF's insolation levels) would result in "irreparable harm" to Robin MCF and that "an award of damages would be inadequate to remedy such a breach" thereby entitling Robin MCK "to equitable relief, including specific performance."

    ii.    Similarly, in Section 8(c)(iii) of the PPA, the parties agreed that interference with the insolation levels of the SEF would irreparably harm Robin MCK "and that an award of damages may be inadequate to remedy such a breach, and that therefore [Robin MCK] shall be entitled to seek equitable relief, including specific performance, to compel [McKesson's] compliance with the provisions of this Section 8(c)."

251.    McKesson's refusal to allow Robin MCK to repair, replace, maintain, and/or operate the rooftop portion of the SEF directly interferes with, or is substantially similar to the interference with, the insolation levels of the SEF and therefore breaches the PPA and the Lease.

252.    McKesson's refusal to allow Robin MCK access to repair, replace, and maintain the SEF poses a safety risk because Robin MCK cannot ensure that its equipment is still in good

working condition after nearly two years of being denied access to repair the equipment. This risk was created solely because McKesson refuses to allow Robin MCK to maintain its systems. McKesson's action, therefore, created the risk of fire or other property damage that they have claimed exists, but would not exist if the Court grants specific performance for Robin MCK to access the rooftop to repair, replace, and maintain the SEF.

253.    McKesson's actions to keep the SEF disconnected create safety risks with the threat of personal injury and property damage. The rooftop SEF is still generating electricity, although it has no output to the Warehouse or to the grid. If the safety mechanisms fail because McKesson refuses to allow Robin MCK to repair, replace, and maintain its system, the generated electricity could be discharged into the building's structure, potentially damaging the Warehouse and injuring people. This can be prevented by allowing Robin MCK access to perform its entitlements under the PPA and Lease.

254.    The terms of the PPA and Lease clearly provide that Robin MCK is to be allowed access to the SEF.

    i.    Section 9(b) of the PPA provides that "[i]n the event of any material loss, theft, damage or destruction of the System, resulting from or arising out of any cause . . . [Robin MCK] shall have the right, in its sole discretion, to repair or replace the System . . . ."

    ii.    Section 2(b)(ii) of the Lease allows Robin MCK to access "each part" of the Premises "for all purposes and activities in any way related, connected or necessary to . . . the installation, construction, operation, interconnection, use, maintenance, repair and removal of" the System.

iii. Section 10(vi) of the Lease allows Robin MCK "to maintain, clean, repair, replace, and dispose of part or all of" the System and "to perform (or cause to be performed) all tasks necessary or appropriate, as reasonably determined by [Robin MCK], to carry out the activities set forth in this Lease."

255.    To date, McKesson has been able to but has failed to perform its obligations under the Lease and PPA.

256.    Robin MCK only requests the performance of McKesson's existing obligations under the Lease and PPA.

### FOURTH COUNT
### PERMANENT INJUNCTION

257.    Robin MCK repeats and incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

258.    Pursuant to the PPA and Lease, Robin MCK is entitled to access the SEF to repair, replace, maintain, and operate the SEF.

259.    As such, Robin MCK has a substantial likelihood of prevailing on the merits of this action.

260.    Robin MCK, as well as the general public, will suffer irreparable harm if the Court does not issue an injunction to enjoin McKesson from interfering with Robin MCK's contractual right of entry to repair, replace, maintain, and operate the SEF.

261.    The failure to prevent McKesson from interfering with Robin MCK's contractual right of entry threatens the integrity of the SEF, which is still generating electricity but is not being maintained because of McKesson's refusal to allow Robin MCK entry.

262.    This refusal to allow Robin MCK entry to repair, replace, maintain, and operate the SEF can create a safety risk due to the degradation of the safety features on the SEF because of McKesson's refusal to allow Robin MCK access.

263.    McKesson will suffer little to no harm as a result of the requested relief. Its contractual obligations require it to allow Robin MCK the right of entry.

264.    Granting the requested relief is in the public interest.

   i.    The public has an interest in ensuring the SEF is maintained so as not to create a safety risk due to lack of maintenance.

   ii.    The public has an interest in cheap and renewable energy sources.

265.    As detailed the PPA and the Lease, Robin MCK does not have an adequate remedy in the law.

**FIFTH COUNT**
**BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**

266.    Robin MCK repeats and incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

267.    Robin MCK and McKesson entered into a contract (the PPA and Lease) and Robin MCK performed all, or substantially all, of the significant obligations required by the contract.

268.    All conditions required for McKesson's performance have occurred. However, McKesson acted in a manner that prevented Robin MCK from receiving the benefits under the PPA and Lease, specifically by falsely claiming that Robin MCK's System caused the fire that damaged the Building and HVAC unit, refusing to allow Robin MCK access to the Premises, by categorically refusing to allow Robin MCK to operate the System, and by attempting to circumvent its obligations under the contract by unlawfully invoking the termination for convenience clause while already in breach of contract.

269.    By acting in this manner, McKesson did not act fairly and in good faith and that Robin MCK was harmed by McKesson's conduct.

**SIXTH COUNT**
**<u>NEGLIGENCE</u>**

270.    Robin MCK repeats and incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

271.    McKesson had a duty to keep its HVAC system in good operating condition and repair to prevent damage to its own building and Robin MCK's System.

272.    McKesson had the additional duty to keep the HVAC system from creating a fire risk.

273.    McKesson failed to ensure that its HVAC system was in good operating condition and repair.

274.    McKesson failed to keep the HVAC system from creating a fire risk.

275.    Upon information and belief, McKesson failed to periodically service the HVAC system to ensure that it was in good operating condition and repair.

276.    As a direct result of McKesson's failure to keep the HVAC system in good operating condition and repair, one of the roof-top HVAC units ignited, causing a fire that spread to Robin MCK's System.

277.    The Fire damaged Robin MCK's System.

278.    But for the Fire, Robin MCK would not have suffered any damage, including property damage and lost profits.

279.    As a direct result of McKesson's failure to keep an HVAC unit in good operating condition and repair, Robin MCK suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff demands judgment as follows:

a.      On the First Count, a declaratory judgment in its favor in the form set forth in the

b.      On the Second Count for breach of contract, a money judgment in an amount to be determined at trial and in no event less than $18,000,000.00.

c.      On the Third Count, an order of specific performance as set forth therein.

d.      On the Fourth Cause of Action, an order enjoining McKesson from committing further actions in violation of the Agreements, including allowing Robin MCK access to the SEF to repair, replace, maintain, and operate the SEF.

e.      On the Fifth Count for breach of the duty of good faith and fair dealing, a money judgment in an amount to be determined at trial and in no event less than $18,000,000.00.

f.      On the Sixth Count for negligence, a monetary judgment in an amount to be determined at trial.

g.      Contractual interest as provided for in section 4(b) of the PPA.

h.      Prejudgment interest running from the date of the breach in an amount provided in California Civil Code § 3287 and, to the extent applicable, Rule 4:42-11 of the New Jersey Rules of Court.

i.      Post-Judgment interest.

j.      Costs, disbursements, and attorneys' fees as fully authorized by law;

k.      Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial as to all issues so triable.

## <u>LOCAL CIVIL RULE 11.2 CERTIFICATION</u>

Pursuant to 28 U.S.C. §1746, the undersigned hereby certifies that the mater in controversy herein is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Dated: July 21, 2025

BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP

 */s/ Paul Kremer*
Paul Kremer (NJ No. 421702023)
Edward C. Wipper (*pro hac vice* pending)
Continental Plaza II
411 Hackensack Ave., 3rd Floor
Hackensack, New Jersey 07601-6323
(646) 593-7050
ewipper@beneschlaw.com

*Attorneys for Plaintiff*